UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CONFEDERATE MOTORS, INC., | ) | |
| | ) | |
| Plaintiff / | ) | |
| Counterclaim Defendant, | ) | CIVIL ACTION |
| v. | ) | NO. 11-10213-JGD |
| | ) | |
| FRANCOIS-XAVIER TERNY, | ) | |
| | ) | |
| Defendant / | ) | |
| Counterclaim Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| HERBERT MATTHEW CHAMBERS, | ) | |
| | ) | |
| Counterclaim Defendant. | ) | |

## MEMORANDUM OF DECISION AND ORDER ON
## PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT

July 18, 2011

DEIN, U.S.M.J.

### I. INTRODUCTION

This matter is before the court on Confederate Motors, Inc.'s "Motion to Enforce Settlement." Docket No. 88. By this motion, Confederate contends that it reached a settlement agreement with the defendant, Francois-Xavier Terny, through attorney emails. Terny denies that a settlement had been reached. The parties have submitted various affidavits, and no one has requested an evidentiary hearing. Oral argument on the motion was held before this court on June 23, 2011. After consideration of the record and

arguments of counsel, and for the reasons detailed herein, the Motion to Enforce Settlement is DENIED.

## II. STATEMENT OF FACTS[1]

Confederate is a publicly-traded corporation engaged in the business of designing and manufacturing handcrafted street motorcycles. Herbert Matthew Chambers was the Chairman of the Board of Directors at all relevant times. According to Terny, beginning in the latter part of 2008, he was courted by Confederate to provide financing to the company pursuant to a private placement memorandum dated November 1, 2008. See, e.g., Docket No. 84 ¶ 12. Between December 2008 and September 2009, Terny invested $450,000 in Confederate in exchange for 300,000 shares of company stock. Id. at ¶¶ 24-29.

In April 2009, Terny was appointed to Confederate's Board. Id. at ¶ 32. In September 2009, he entered into a Consulting Agreement with Confederate pursuant to which he received an additional 505,000 shares of the company in exchange for his services. Id. at ¶ 33. According to Terny, the Consulting Agreement "specifically called for Mr. Terny to 'work with the Company to form the distribution channels for all the worldwide retail stores for distribution of the Company's motorcycles, work with the

---

[1] The facts are derived from the Third Amended Complaint filed by Confederate in the Northern District of Alabama, Docket No. 70-1; Terny's Answer, Docket No. 83; Terny's Counterclaim and Jury Demand, Docket No. 84; and various pleadings and affidavits filed in connection with the motion to enforce the settlement agreement. While this court acknowledges that many subsidiary facts are in dispute, and takes no position on the truth of such contested facts, the material facts relating to the communications at issue are undisputed.

company to decrease the material costs necessary to produce its motorcycles, and such other services to and for the Company as may be reasonably requested from time to time by the Company.'" Id. The Consulting Agreement also contained a forum selection clause which provided that disputes would be resolved in the Commonwealth of Massachusetts. Id. at ¶ 5.

Disagreements apparently soon arose between Chambers and Terny concerning the operations of the company. In particular, but without limitation, Terny objected to proposals concerning a new motorcycle line, the appointment of new directors, the acceptance of a $750,000 relocation loan from the City of New Orleans, and the return of the corporation to its original place of business in New Orleans. See Docket No. 70 ¶ 1. On January 5, 2010, Terny sent an email to Chambers, which read in relevant part as follows:

> I have no intention to continue working like this, and certainly no intention to be part of the plan outlined below.... I've hence decided to quit as a "consultant" (and give back any share), publicly resign as Boardmember, and put back my shares on the market to liquidate my investment in Confederate.

Docket No. 1 (original Complaint) Ex. D. Confederate contends that this constituted Terny's resignation from the Board, which Terny denies. Rather, according to Terny, his discussions with the company continued and he continued to be treated as a member of the Board of Directors. See Docket No. 83 ¶ 1. Nevertheless, three months later, on April 5, 2010, Confederate sent Terny a letter which stated:

3

> This is to confirm and accept in writing your resignation of January 5th, 2010 as director and consultant of Confederate Motors, Inc. effective as of said date.

Docket No. 1 Ex. E.

Following its letter, Confederate commenced an action against Terny on April 8, 2010 in the United States District Court for the Northern District of Alabama, Southern Division, where Confederate's principal place of business was located. See Docket No. 1. Therein, Confederate sought a declaratory judgment as to the parties' rights and obligations under their agreements and the corporate documents, including whether Terny was a Director, how much, if any, shares of stock of the company he rightfully owned, and whether he had breached his Consulting Agreement, among other things. On May 14, 2010, Terny filed a motion to dismiss the case alleging, inter alia, that the amount in controversy was less than the jurisdictional minimum of $75,000 and that any case had to be brought in Massachusetts. See Docket No. 20. The docket indicates that the parties spent the next several months addressing the status of numerous defaulted defendants and amending the complaint.

On December 13, 2010, Terny, through his counsel Laurence McDuff, filed a Motion to Enforce Forum Section Clause seeking to have the Alabama case dismissed, with leave to have Confederate refile it in Massachusetts. Docket No. 76. On December 15, 2010 the motion was scheduled for oral argument on January 21, 2011. Docket No. 77. Meanwhile, counsel for both parties had begun to explore a possible settlement. In a

December 9, 2010 email, Chance Turner (attorney for Confederate) proposed the following:

> We feel a reasonable solution for all parties is the mutual release of all existing claims, the return of the consulting shares (505,000) to the corporation, and one hundred and fifty thousand dollars for fees, expenses and compensatory damages. I believe my client would be interested in accepting all corporate shares now in your client's possession in lieu of a cash payment. <u>Please respond to this offer within two weeks.</u>

<u>Docket No.</u> 89 (Confederate's Brief) Ex. 3 (emphasis added). Laurence McDuff (attorney for Terny) replied six days later, on December 15, with a "counteroffer" in which Terny "will agree to return the 505,000 shares, and execute mutual releases, but he is not willing to pay the monetary component of your offer." He concluded with "[h]opefully we can work something out along these lines."

Attorney Turner responded one week later, on December 22, 2010. In his email he wrote:

> I spoke with my client regarding your counteroffer. In the interest of settlement, we can reduce the monetary component to one hundred thousand. Let me know what your client thinks.

<u>Id.</u> Attorney McDuff replied six days later, on December 28. In his email he wrote:

> Francois still is willing to return the 505,000 shares and execute mutual releases, but he declines to pay you any monetary component.

<u>Id.</u> Attorney Turner did not reply.[2]

---

[2] According to Attorney McDuff, he believed his email of December 28th to be a rejection of Attorney Turner's offer of December 22nd. <u>Docket No. 98</u> (McDuff Affidavit) ¶ 13.

The litigation proceeded. On January 18, 2011, Confederate (through Attorney Turner) filed a response to the pending motion to enforce the forum selection clause. Docket No. 78. On January 20, 2011, Terny (through Attorney McDuff) filed a reply brief in support of his motion to enforce the forum selection clause. Docket No. 79. At no time between December 28, 2010 and January 21, 2011, when the motion was heard, did the parties discuss settlement. Similarly, in none of their pleadings with the court did any party represent that there were ongoing settlement negotiations or that the case had been settled.

Oral argument was heard on January 21, 2011 in the Alabama District Court. Confederate opposed the motion to enforce the forum selection clause. At the hearing, the court denied the request that the action be dismissed, but granted the alternative relief that the case be transferred to Massachusetts. This was confirmed by a written order on January 24, 2011. Docket No. 80.

Counsel disagree as to what happened in court after the District Judge ruled that the case was to be transferred to Massachusetts. As detailed below, however, under any version of events, as of the time of the court's oral order transferring the case to Massachusetts, there was no firm offer by Terny outstanding. Thus, Attorney Turner attests that after the court's ruling, he asked Attorney McDuff "Is that offer still open because this [hearing] may make my client reconsider its position?" According to Attorney Turner, Attorney McDuff responded "Yes" and went on to say that "he would be available the next week if Confederate wanted to resolve the case." Docket No. 109-1

6

(Turner Affidavit) at ¶¶ 8-9.  For his part, Attorney McDuff denies that any such conversation took place.  <u>Docket No.</u> 111-1 (Supplemental McDuff Affidavit) ¶ 4.  Rather, he says that "[t]he only discussion concerning settlement was Mr. Turner's statement to me that he suspected the court's order transferring the case might cause his client to 'reconsider its position' on the settlement value and if so he would let me know."  <u>Id.</u> at ¶ 5.

On January 24, 2011, nearly four weeks after Attorney McDuff's last email regarding a possible settlement, Attorney Turner sent Attorney McDuff the following email:

> After lengthy discussions with my client, <u>we are prepared to accept</u> your last offer of settlement under the terms set forth in your last e-mail.  Please give me a call or e-mail tomorrow to discuss this issue.  Thanks.

<u>Docket No. 89</u> Ex. 3 (emphasis added).  This was apparently in response to Attorney McDuff's December 28th communication quoted above.  Attorney McDuff responded on January 25, 2011, writing that he had "forwarded this to Francois [Terny] and will get back with you when I have his response."  On January 26, 2011, Attorney McDuff followed up with an email to Attorney Turner stating:

> Chance, now that the case is being transferred, my client has asked me to let Eric Galler handle any further <u>settlement discussions</u>.  Eric is aware of your <u>last offer</u>.

<u>Id.</u> (emphasis added).  Attorney McDuff then provided Attorney Galler's contact information.  Attorney Turner did not object to the characterization of his January 24th communication as an "offer," nor did he indicate that there was no need for further

7

"settlement discussions" since a deal had been struck. Rather, on February 3, 2011, he sent the following email to Attorney Galler:

> I apologize for not contacting you sooner. I've been in trial this week. I just wanted to touch base before the case was transferred to Boston. <u>At this time, we accept the last offer</u> on 12/28/10 from Mr. Terny. There has been no retraction of that written offer, so I am <u>under the impression that offer is still valid.</u> <u>Please let me know your position as soon as possible.</u> We are experiencing a winter storm here, so I may be unable to get to the office tomorrow.

<u>Docket No.</u> 89 Ex. 4 (emphasis added). No further settlement discussions took place and no draft documents were exchanged.[3] Rather, on February 22, 2011, Terny filed claims against Confederate and Chambers in this court, including claims for breach of fiduciary duty, violation of the Blue Sky laws, fraud, and negligent misrepresentation. In addition to seeking monetary damages, Terny is seeking a declaration that he is the owner of 805,000 shares of Confederate. <u>Docket No.</u> 84 ¶ 123. On March 14, 2011, Confederate filed the instant motion to enforce the settlement agreement.

Additional facts will be provided below where appropriate.

### III. <u>ANALYSIS</u>

#### A. <u>Standard of Review</u>

The court has "an inherent power to supervise and enforce settlement agreements entered into by parties to an action pending before the court." <u>Dankese v. Defense</u>

---

[3] According to Attorney Galler, he understood this communication to be an offer to settle, and since he was not authorized by Terny to settle the dispute, he did not respond. <u>Docket No.</u> 99 (Galler Affidavit) ¶¶ 5-8.

8

Logistics Agency, 693 F.2d 13, 16 (1st Cir. 1982) (internal citations omitted). "Motions for enforcement of settlement agreements resemble motions for summary judgment." Leonard v. Univ. of Delaware, 204 F. Supp. 2d 784, 786 (D. Del. 2002). Where, as here, the material facts are not in dispute, it is for the court to determine whether a contract has been formed. See Moore v. La-Z-Boy, Inc., 639 F. Supp. 2d 136, 140 (D. Mass. 2009) ("[w]hether purported contract contains the necessary elements for enforceability is (ordinarily) a question of law reserved for the court") (citing Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 709, 592 N.E.2d 1289, 1293 (1992)); Rainbow Invs., Inc. v. Super 8 Motels, Inc., 973 F. Supp. 1387, 1390 (M.D. Ala. 1997) (when "not merely the enforceability, but the initial formation or existence of a contract . . . is legitimately brought into question," the issue "must be decided by the court"). As detailed below, this court concludes that there is no enforceable agreement.

As an initial matter, however, this court must address the issue of which jurisdiction's law should apply. Confederate seems to contend that Delaware law controls, since the Consulting Agreement provides that it should be "construed, interpreted and enforced in accordance with the laws of the State of Delaware[.]" Docket No. 89 at 1-2. Additionally, Confederate cites to the law of Alabama "where the settlement occurred[.]" Id. at 4. For his part, Terny has cited to Alabama law, but recognizes that the law of Massachusetts (the forum state), New York (where Terny resides), Alabama (where counterclaim defendants reside) or Delaware (site of Confederate's incorporation) may be relevant. See Docket No. 97 (Terny's Opposition) at 6 n.1.

9

In this court's view, the choice of law provision in the Consulting Agreement has no application to the issue whether there is an enforceable, separate, settlement agreement, and there is no other basis for applying Delaware law. Similarly, the fact that Terny is a New York resident does not make the law of that state controlling. It is most logical that either the law of Alabama (where the settlement agreement was allegedly reached), or Massachusetts (the forum state), should apply. Furthermore, the First Circuit has recognized that settlement of a pending federal case "implicates matters of considerable federal concern, entirely apart from the substantive merits" and it may be that the issue of whether there is an enforceable settlement agreement should be governed by federal common law. See Mathewson Corp. v. Allied Marine Indus. Inc., 827 F.2d 850, 853 n.3 (1st Cir. 1987), and cases cited; Caraballo Cordero v. Banco Financiero de P.R., 208 F. Supp. 2d 185, 188-89 (D.P.R. 2002), and cases cited. In any event, the question of which state's law should apply need not be resolved here because, as the parties recognize, all the possible jurisdictions apply the same "black letter law" to the issue of whether a contract has been formed. See Docket No. 97 at 6 n.1, Docket No. 89 at 3-4. This court is "confident that, by whichever standard the efficacy of the settlement is measured, the result would not vary." Mathewson, 827 F.2d at 853 n.3.

In the formation of a contract, "[a]n offer must be matched by an acceptance. A counteroffer proposing a term that is materially different from that contained in the original offer constitutes a rejection of the offer and negates any agreement." Kennedy v. JP Morgan Chase Nat'l Corp., No. 10-CV-11324-RGS, 2011 WL 1576569 at *2 (D.

10

Mass. Apr. 26, 2011) (internal citations omitted). See also Shewmake v. Estate of Shewmake, 940 So.2d 260, 265 (Ala. 2006) (under "ordinary principles of contract formation" there must be "an offer and an acceptance, consideration, and mutual assent to terms essential to the formation of a contract") (internal citations omitted)). Moreover, "[i]t is hornbook law that an offeree's power of acceptance vanishes at the time specified in the offer, and if no deadline is prescribed, at the end of a reasonable time." Mathewson, 827 F.2d 850, 853 (1st Cir. 1987) (internal citations omitted). See also Restatement 2d Contracts § 41(1) (1981) ("An offeree's power of acceptance is terminated at the time specified in the offer, or, if no time is specified, at the end of a reasonable time"). Finally, in order for an enforceable contract to exist, the parties must have reached an agreement on all essential terms. See, e.g., Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878, 724 N.E.2d 699, 703 (2000) ("It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement."); Sagamore Ins. Co. v. Sudduth, 45 So.3d 1286, 1290 (Ala. Civ. App. 2010) ("settlement agreements, like other agreements, are not valid when there has been no meeting of the minds with regard to the final terms of the agreement") (quoting Grayson v. Hanson, 843 So.2d 146, 150 (Ala. 2002)). Application of these principles to the instant case compels the conclusion that there is no enforceable settlement agreement.

   B.    **Confederate's Response Was Not Timely**

Assuming, arguendo, that Attorney McDuff's email of December 28th was a firm offer (but see discussion infra), it had expired before Confederate responded a month later, on January 24th. Under the circumstances of these parties' interactions, the response was not made within a reasonable time.

In its initial offer, Confederate made it clear that negotiations were to proceed at a fairly rapid pace: thus in his December 9th email, Attorney Turner requested a response "within two weeks." Thereafter, the parties responded to each other in no more than a week, with Attorney McDuff responding on December 15, 2010, Attorney Turner responding on December 22, 2010 and then Attorney McDuff replying on December 28, 2010. Thus, the parties clearly intended that any response would be made promptly. There is no basis in the record for Confederate to have assumed that an offer would remain open for a month. See Crellin Techs., Inc. v. Equipmentlease Corp., 18 F.3d 1, 9 (1st Cir. 1994) ("four months is an unreasonably long time for a financing offer to remain open" given "rapidly fluctuating interest rates" so "it would have been thoroughly unreasonable for appellant to believe that a sale/leaseback proposal made in November and not then accepted would linger on the table until the following March").

Moreover, there are "no *objective* facts to suggest" that Confederate believed that the "offer" of December 28th remained open as of the time of the hearing. Mathewson, 827 F.2d at 853 (emphasis in original) (court looks to objective facts and conduct of the parties in assessing timeliness). For example, on January 18, 2011 Confederate affirmatively filed a response to the pending motion to enforce the forum selection clause,

12

without indicating that the parties were engaged in settlement negotiations. At the oral argument on January 21, 2011, Confederate again did not represent to the court that it was engaged in settlement discussions but, rather, addressed the motion on the merits. In fact, at no time during the period between December 28th and January 21st did Attorney Turner indicate that his client was considering the "offer." Even after the ruling adverse to Confederate on January 21, 2011, Attorney Turner contends that he asked if "that offer [was] still open" because his client might "reconsider its position" as a result of the transfer of the case to Massachusetts. See Docket No. 109-1 ¶¶ 8-9. Such conduct makes it clear that Confederate's attorney knew that there was no outstanding offer for Confederate to accept at the time of the Alabama court's ruling.

## C. There Was No Subsequent Agreement

Attorney Turner asserts, and Attorney McDuff denies, that Attorney McDuff told him in court on January 21st that the offer was still open. Assuming, arguendo, that Attorney Turner is correct,[4] Confederate's communication of January 24th still did not create a binding settlement agreement. First of all, the language used in the January 24th email was that of negotiation, not of acceptance of an offer creating a binding agreement. Specifically, Attorney Turner merely indicated that Confederate "was prepared to accept"

---

[4] It is hard to accept that Terny's attorney would have confirmed that a settlement offer was open without first consulting with his client, especially since the client had just won a significant victory which changed the course of the parties' litigation. Nevertheless, the parties have not asked the court to resolve the differences between the attorneys' versions of events, and no such resolution is needed under this court's analysis.

13

Terny's offer – not that it <u>was</u> accepting the offer. He also indicated that further discussion among counsel was needed. Indeed, in his subsequent communication of February 3rd, Attorney Turner indicated an intention to accept the offer "at this time," thereby negating any claim that an offer had been accepted earlier. The undisputed facts negate Confederate's claim that it accepted a firm offer by its January 24th communication.

Perhaps even more importantly, immediately after Attorney Turner's January 24th communication, Attorney McDuff informed him by email dated January 25, 2011 that he had forwarded the communication to Terny and "will get back with you when I have his response." Attorney McDuff subsequently informed Attorney Turner that Confederate's "offer" had been conveyed to successor counsel, and that successor counsel was to be involved in any "settlement negotiations." These communications made it clear that Attorney McDuff did not have the authority to make a binding settlement agreement after the Alabama court's ruling. "[A] settlement agreement entered into by an attorney is ineffective if the attorney did not possess actual authority to bind the client, and the cases so hold." Malave v. Carney Hosp., 170 F.3d 217, 221 (1st Cir. 1999), and cases cited.[5]

---

[5] The same result would be reached under Section 34-3-21, Alabama Code, which provides that "An attorney has authority to bind his client, in any action or proceeding, by any agreement in relation to such case, made in writing, or by an entry to be made on the minutes of the court." Here there was no entry on any court docket reflecting an agreement. Moreover, "[t]here is no document in the record showing that a 'meeting of the minds' ever occurred to the extent that any of the documents were signed" by the parties or their attorneys. See Phillips v. Knight, 559 So.2d 564, 568 (Ala. 1990) Here, neither Terny nor Confederate signed any documents, and all of Terny's counsels' communications following the January 24th email made it clear that Terny did not believe the matter had been settled.

14

Finally, the language used by Attorney Turner in his February 3rd communication (purporting to "accept the last offer" "[a]t this time") makes it clear that he knew that it was questionable whether the parties had a binding agreement. He spoke of being "under the impression that the offer was still valid" and asked for Terny's "position as soon as possible." At no time following this communication did Confederate forward any settlement documents to Terny for signature, or take any steps to effectuate the stock transfer referenced in the communications. In sum, all of the conduct of the parties and their counsel compel the conclusion that Confederate did not accept any offer within a reasonable time. There is no enforceable settlement agreement.

### D. There Was No Meeting of the Minds

In light of this court's conclusion that Confederate failed to accept any offer within a reasonable time, there is no need to reach the numerous other issues raised by the parties. This court does note, however, that the motion to enforce the so-called settlement agreement would fail for a number of other reasons in addition to the timeliness of Confederate's alleged response. For example, but without limitation, at most Terny had proposed a settlement "along [the] lines" of returning the 505,000 shares and executing mutual releases, but he had never indicated that these would be the only terms of a settlement agreement. See McDuff email of 12/15/10. Thus, the December 28th email was "plainly not a firm offer" but was rather a willingness to engage in further discussions along the lines proposed in the email. See Webster v. Bowles, 213 F.2d 417, 419-20 (1st Cir. 1954) (telegram expressing a desire "to discuss" the matter was not an acceptance of

an alleged offer). Since Terny did not intend the December 28th communication to be a legally binding document, no contract was formed. See McCarthy v. Tobin, 429 Mass. 84, 87, 706 N.E.2d 629, 631 (1999) (in determining whether a contract has been reached, "[t]he controlling fact is the intention of the parties. . . . [A] promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract.") (internal quotations omitted).

Moreover, but again without limitation, the terse emails did not address the number of other issues in dispute between the parties which would need to be addressed before the exchange of mutual releases would be warranted. For example, Terny is the record holder of 805,000 shares of stock, not only the 505,000 shares which he had obtained pursuant to the Consulting Agreement, yet the emails are silent as to the status of the remaining 300,000 shares. Similarly, the emails are silent as to Terny's status as a member of the Board of Directors, a key issue in the dispute between the parties. The undisputed facts negate any conclusion that the parties had addressed all the issues they needed to resolve before terminating their lawsuit.

## IV. CONCLUSION

For the reasons detailed herein, the Plaintiff's Motion to Enforce Settlement, Docket No. 88, is DENIED.

    / s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge